Bryan J. Freedman, Esq. (SBN 151990)
  bfreedman@ftllp.com
September Rea (SBN 261121)
  srea@ftllp.com
FREEDMAN & TAITELMAN, LLP
1901 Avenue Of The Stars, Suite 500
Los Angeles, CA 90067
Telephone: (310) 201-0005
Facsimile: (310) 201-0045

Attorneys for Defendants Keenen Ivory Wayans,
Shawn Wayans, Marlon Wayans,
Wayans Bros. Productions, and
St. Martin's Press, Inc. (now known as
SMP (1952) Inc.)

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JARED EDWARDS,<br><br>        Plaintiff<br><br>vs.<br><br>KEENEN IVORY WAYANS,<br>SHAWN WAYANS, MARLON<br>WAYANS, WAYANS BROTHERS<br>PRODUCTIONS, AND ST.<br>MARTIN'S PRESS, INC.,<br><br>        Defendants. | CASE NO. 2:10-cv-02231 R (RCX)<br><br>**DECLARATION OF ELIZABETH BEIER IN SUPPORT OF JOINT MOTION FOR SUMMARY JUDGMENT**<br><br>Date: January 18, 2011<br>Time: 10:00 a.m.<br>Location.: Courtroom 8<br><br>[Filed Concurrently With Notice of Motion and Joint Motion for Summary Judgment, Statement of Uncontroverted Facts and Conclusions of Law; Declarations of Jay S. Glick, Paul S. Sleven, and September Rea; Joint Request for Judicial Notice and [Proposed] Order Granting Summary Judgment] |

///

///

1

DECLARATION OF ELIZABETH BEIER IN SUPPORT OF
JOINT MOTION FOR SUMMARY JUDGMENT

I, Elizabeth Beier, declare as follows:

1.   I am an Executive Editor at St. Martin's Press, LLC and I have held this position for twelve years.  As a result of my employment with and by St. Martin's Press, LLC, I have personal knowledge of each matter stated herein.

2.   The book entitled "101 Ways to Know You're a Golddigger" ("*Golddigger*"), which is the subject of the Complaint filed by Plaintiff Jared Edwards in this action, had an official publication date of June 9, 2009 by St. Martin's Press, LLC.

3.   In September 2005, I met with Keenen Ivory Wayans, Shawn Wayans, Marlon Wayans, Rick Alvarez and Tracy Fisher from the William Morris Agency ("WMA") in New York at SMP's offices to discuss the possibility of publishing a cartoon book series authored by the Wayans.  The idea was to publish paperback books consisting of 101 illustrated jokes each with a different common theme.  The series would be entitled "101 Ways to Know…" and the books would be in the vein of a book entitled "150 Ways to Tell You're Ghetto" published by Dell Publishing, a division of Bantam Doubleday Dell Publishing, Inc. that Shawn Wayans had co-authored in 1997.

4.   Based upon the Wayans' past success in comedy, both television and film, and sales of similar books, SMP submitted a bid to publish three untitled books in the series.

5.   After the Wayans accepted SMP's offer, SMP negotiated a contract with the Wayans, through WMA, to publish three untitled books in the series.  At the time SMP entered into the contract, there was no decision as to which three titles in the series would be published.

6.   SMP entered into a written contract with SMK Merchandising, LLC ("SMK Merchandising") for the publication of three untitled books in the "101 Ways to Know" series.  The three titles were initially referred to in the contract as #1-101 Ways to Know…#1, #2-101 Ways to Know…#2, and #3-101 Ways to

DECLARATION OF ELIZABETH BEIER IN SUPPORT OF
JOINT MOTION FOR SUMMARY JUDGMENT

1  Know…#3.

2      7.      After discussions with representatives of the Wayans, SMP agreed to

3  publish the following three titles: (1) 101 Ways to Know It's Time to Get Out of

4  Your Mama's House ("*Mama's House*"); (2) 101 Ways to Know You're Having a

5  Ghetto Christmas ("*Ghetto Christmas*"); and (3) 101 Ways to Know You're a

6  Golddigger ("*Golddigger*") (collectively the "101 Ways to Know Series").

7      8.      The written contract by and between SMK Merchandising and SMP

8  was amended in 2006 to reflect the finalized titles of the books.  A true and correct

9  copy of the amended contract is attached here to as **Exhibit "A"** and incorporated

10  herein.  SMP does not presently have a written contract to publish any other books

11  in the 101 Ways to Know Series.

12      9.      Pursuant to the terms of the amended contract, SMP advanced five

13  hundred thousand dollars ($500,000) to the Wayans, through SMK Merchandising

14  for the three titles in the "101 Ways to Know" series, with one/third allocated to

15  *Golddigger*.  *See*, Exhibit A, at page 2 ("Advance").  Two hundred fifty thousand

16  dollars and one cent ($250,000.01) of the Advance was paid by check dated

17  February 8, 2006 made payable to William Morris Agency, Inc.  This portion of

18  the Advance was paid prior to delivery and acceptance of three titles in the 101

19  Ways to Know Series.  The contract specifies that the Advance is to be applied

20  equally to the three 101 Ways to Know Series titles.

21      10.      Initially, the three books in the 101 Ways to Know Series would be

22  published in 2006.  The creation of the books was delayed and SMP had to push

23  back the publication dates for the 101 Ways to Know Series several times.

24      11.      SMP finally published *Ghetto Christmas* in paperback with an official

25  publication date of October 27, 2009.  SMP published both *Mama's House* and

26  *Golddigger* in paperback with official publication dates of June 9, 2009.

27      12.      In the regular course and scope of its business, SMP tracks title sales

28  for titles published by SMP including for *Golddigger*.  As of December 13, 2010,

3

DECLARATION OF ELIZABETH BEIER IN SUPPORT OF
JOINT MOTION FOR SUMMARY JUDGMENT

revenue for *Golddigger*, net returns of unsold books and ignoring all costs of publication and the author advance is $5,681.00.    Simply taking into account the author advance, and still ignoring costs of publication, SMP has *lost* approximately $160,319 on *Golddigger*.  A true and correct copy of a summary of "Title Sales Summary by Month" is attached hereto as **Exhibit "B"** and incorporated herein by reference.

13.    I do not recall having any conversations, via telephone or in person, with Jared Edwards regarding the 101 Ways to Know Series or any other matter.  I do not recall ever having met Jared Edwards.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on December 15, 2010.


                                    Elizabeth Beier                12/15/10

DECLARATION OF ELIZABETH BEIER IN SUPPORT OF
JOINT MOTION FOR SUMMARY JUDGMENT

# Exhibit "A"

*Bk2- 0312 - 357703 Lip*
*Bk3 - 0312 - 359691*
*1312006003*
*7777735868*

FEB - 3 2006 EB

# S T .   M A R T I N ' S   P R E S S   C O N T R A C T

***Agreement*** made as of this 5th day of October, 2005 between SMK Merchandising LLC care of: William Morris Agency, LLC., 1325 Avenue of the Americas, New York, New York 10019, (the "Author") and ST. MARTIN'S PRESS, LLC, a New York limited liability company with its principal place of business at 175 Fifth Avenue, New York, New York 10010 (the "Publisher").

IT IS MUTUALLY AGREED AS FOLLOWS:

**THE GRANT AND THE TERRITORY**

1. The Author hereby grants and assigns to the Publisher:

(a)    The sole and exclusive right to print, publish, distribute and sell ("publish") in the English language in book form, and to license others to do so, works now entitled:


*Loser ) Momma's House*
*Ghetto*
*Goldigger*
Shawn Wayans and Marlon Wayans

(individually a "Book" and collectively the "Work") in the following territories (collectively the "Exclusive Territory"):

**throughout the world**

(b)    ~~The same right, but non-exclusively, in the Open Market, i.e., the rest of the world except the following territories (collectively the "Excluded Territory"):~~

(c)    The additional and subsidiary rights in the Work hereinafter set forth. Each of the rights granted and assigned by this Agreement shall continue for the full period(s) of copyright protection in each of the applicable countries, **except as provided with respect to Sound Reproduction Rights in subparagraph 6(b) below.**

**PUBLICATION**

2.    (a)    The Publisher agrees to publish the Work in a **trade paperback edition** at its own expense within twelve (12) ~~eighteen (18)~~ months after acceptance of the final manuscript, except that such twelve (12) ~~eighteen (18)~~ month period shall be extended for a period of time equal to any delay caused by the Author or by any circumstances beyond the Publisher's control (including without limitation, shortages or interruptions of materials or supplies, orders of courts, labor controversies, acts of government, and acts of God).

(b)    If the Publisher does not publish the Work within the time above provided, the Author may at anytime thereafter serve a written demand upon the Publisher requiring the Publisher to publish the Work. If the Publisher does not comply within thirty (30) ~~ninety (90)~~ days after receipt of such written demand, then this Agreement shall terminate without further notice at the end of such thirty (30) ~~ninety (90)~~ day period. If the Publisher does not publish the Work, the total payments provided for in Paragraph 4 herein such ~~payments as shall already have been made to the Author under this Agreement as advances~~ shall be his to keep and shall be deemed in full discharge of all of the Publisher's obligations to the Author hereunder; no other claims, damages or remedies (whether legal or equitable and whether founded on breach of contract, tort or otherwise) may be pursued against the Publisher by the Author or the Author's agents, heirs or assigns for the Publisher's failure or refusal under any circumstances to publish the Work or to perform any duty owed to the Author where the alleged harm or damage arising therefrom is a failure to publish the Work.

(c)    All decisions as to format, style of printing and binding, cover presentation, trademark, logo, imprint or other identification, retail price, and all other matters involving terms of sale, distribution, advertising and promotion of the Work shall be within the Publisher's sole discretion. The Author shall have approval of any material changes to the text submitted; typographical errors shall not be considered a breach of any obligation by the Publisher. The final title of the Work shall be mutually agreed upon between the Publisher and the Author. The Author shall have approval of the Author's photograph and biographical material included in the Publisher's edition of the Work, such approval not to be unreasonably withheld, conditioned or delayed.   The Author shall have approval of the art to be used on the front cover/jacket of the Publisher's edition of the Work, such approval not to be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing art approval, with respect to the cover design and cover/jacket copy of the Publisher's edition of the Work, the Publisher shall meaningfully consult with the Author, but the final decision, in any event shall be the Publisher's.

1

WAYANS 0021

(d) Subparagraphs (a) and (b) of this Paragraph 2 shall apply separately to each Book comprising the Work. Any termination pursuant to subparagraph (b) shall apply only to the particular Book involved and the reference to advances contained therein shall be deemed to mean the portion of the advance paid that is attributable to that Book; this Agreement shall continue in full force and effect with respect to the other Book(s) comprising the Work.

**COPYRIGHT**

3. The copyright in the Work shall belong to the Author. The Publisher agrees to register the copyright and imprint the copyright notice authorized by United States copyright law in each copy of the Work.

**ADVANCE**

4. The Publisher shall pay to the Author, or the Author's duly authorized representative, an advance against the Author's earnings from all sources under this Agreement of: Five Hundred Thousand dollars ($500,000.00) payable as follows:
Two Hundred Fifty Thousand and One dollars ($250,001.00) upon signing of this Agreement;
Forty One Thousand Six Hundred Sixty Seven dollars ($41,667.00) upon delivery and acceptance of the complete manuscript of #1-101 WAYS TO KNOW...#1;
Forty One Thousand Six Hundred Sixty Six dollars ($41,666.00) upon publication of the Publisher's initial edition of #1-101 WAYS TO KNOW...#1, but no later than twelve (12) months from the date of delivery and acceptance of the complete manuscript of the Work;
Forty One Thousand Six Hundred Sixty Seven dollars ($41,667.00) upon delivery and acceptance of the complete manuscript of #2-101 WAYS TO KNOW...#2;
Forty One Thousand Six Hundred Sixty Six dollars ($41,666.00) upon publication of the Publisher's initial edition of #2-101 WAYS TO KNOW...#2, but no later than twelve (12) months from the date of delivery and acceptance of the complete manuscript of the Work;
Forty One Thousand Six Hundred Sixty Seven dollars ($41,667.00) upon delivery and acceptance of the complete manuscript of #3-101 WAYS TO KNOW...#3; and
Forty One Thousand Six Hundred Sixty Six dollars ($41,666.00) upon publication of the Publisher's initial edition of the Work , but no later than twelve (12) months from the date of delivery and acceptance of the complete manuscript of the Work.

Unless otherwise specified in this Agreement, for the purposes of paragraphs 2, 12 and 17 only, advance payments on signing shall be "attributable" in equal proportions to each Book comprising the Work and amounts due on delivery and acceptance or publication in any form of a particular Book shall be "attributable" to that Book. However, for all other purposes, all amounts paid as advances under this Agreement will be treated as a single advance against earnings from all sources with respect to all the Books.

**ROYALTIES**

5. ~~So long as copyright protection subsists in the Work,~~ The Author shall be entitled to the following royalties:
(a) *Regular Sales of Regular Hardcover Editions.* Except as hereinafter provided, with respect to copies of regular hardcover editions of the Work sold by the Publisher in the United States through regular trade channels:

(i) A royalty at the rate of ten percent (10%) of the list price on the first five thousand (5,000) copies sold, twelve and one-half percent (12½%) of the list price on the next five thousand (5,000) copies sold and fifteen percent (15%) of list price on copies sold thereafter when sold at discounts less than forty eight percent (48%) of list price;

(ii) When sold at discounts from forty-eight through fifty-four percent (48% to 54%) (inclusive) of list price, a royalty at a rate equal to the prevailing rate in (i) above, less one-half the difference between a forty-four percent (44%) discount and the discount granted. The Publisher agrees that not more than 50% of the total number of copies sold through regular sales channels shall be accounted for as sales under Paragraph 5(a)(ii);

(iii) When sold at discounts greater than fifty-four percent (54%) and less than seventy-five percent (75%) of list price, a royalty equal to ten percent (10%) of the amount received by the Publisher; and

(iv) When sold at discounts of seventy-five or more percent (75%) of list price, a royalty equal to ten percent (10%) of the amount determined by deducting all manufacturing costs of the copies so sold from the amount received by the Publisher. (No sales at discounts of seventy-five or more percent (75%) shall be made within one year from the date of initial publication.);

(b) *Electronic Editions.* Except as hereinafter provided, with respect to copies of electronic editions of the Work sold by the Publisher, a royalty to be mutually agreed upon between the parties prior to any such use or disposition. As used in this Agreement, the sale of a copy of an electronic edition of the Work means the sale of a CD-ROM or other physical media containing a copy of the Work in electronic form

2

WAYANS 0022

or the transmission for a fee of a copy of the Work electronically for reading by means of a computer and/or other electronic media.

~~equal to ten percent (10%) of the list price of the electronic edition on the first five thousand (5,000) electronic copies sold, twelve and one half percent (12½%) of the list price of the electronic edition on the next five thousand (5,000) electronic copies sold and fifteen percent (15%) of the list price of the electronic edition on electronic copies sold thereafter (but not more than forty percent (40%) of the amount received by the Publisher from the sale of any copy);~~

(c)     *Special Sales.* Except as hereinafter provided, with respect to copies of hardcover and ~~electronic~~ editions of the Work sold by the Publisher in the United States other than through regular trade channels, including sales to book clubs, reading circles and other special markets, a royalty equal to ten percent (10%) of the amount received by the Publisher, except that if the Author will be entitled to payment under paragraph 7 (Subsidiary Rights-Sharing of Receipts) in conjunction with such sales, then no payment shall be made under this paragraph 5;

(d)     *Export.* With respect to copies (whether bound or unbound) of hardcover editions of the Work sold by the Publisher for resale outside of the United States, a royalty equal to ten percent (10%) of the amount received by the Publisher, except that if the Author will be entitled to payment under paragraph 7 (Subsidiary Rights-Sharing of Receipts) in conjunction with such sales, then no payment shall be made under this paragraph 5;

(e)     *Mail Order.* With respect to copies of hardcover, electronic and audio editions of the Work sold by the Publisher directly to the consumer, including by mail order solicitation, coupon and direct mail, a royalty equal to five percent (5%) of the price offered in the solicitation;

(f)     *Limited Reprint.* With respect to copies of regular hardcover editions of the Work sold by the Publisher in the United States from any reprinting by the Publisher of two thousand five hundred (2,500) copies or less made at least two (2) years after the date of initial publication of the Work, a royalty at a rate equal to three-fourths (3/4) of the rate which would otherwise apply under this paragraph 5. This reduction in royalty is to enable the Publisher to keep the Work in print as long as possible. The same three-quarter (3/4) royalty shall be payable on reprints of twelve hundred fifty (1,250) copies or less made within eighteen (18) months of publication, this rate to enable the Publisher to fulfill out-of-stock back orders or otherwise unfeasibly small quantities which, unfulfilled, are lost forever. The Publisher may only invoke the above provision for a reduction in royalty once, except with the Author's consent.

~~(g)     *Regular Sales of Cheap Hardcover Editions.* With respect to copies of cheap hardcover and electronic editions of the Work (i.e., editions issued at a list price equal to two-thirds (2/3) or less than two-thirds of the list price of the regular edition) sold by the Publisher in the United States through regular trade channels, a royalty at a rate equal to ten percent (10%) of the amount received by the Publisher;~~

(h)     *Premium Sales.* With respect to copies of any hardcover, ~~electronic and audio~~ editions of the Work (or of abridgments thereof) sold by the Publisher in a premium sale or sold to companies or organizations for use or distribution by them in connection with their own activities or with the sale of their own products or services, a royalty equal to five percent (5%) of the amount received by the Publisher; Premium Sales shall be subject to the Author's consent, and will not be unreasonably withheld or delayed;

(i)     *Paperbacks.* With respect to copies of paperback or paper-over boards editions of the Work sold by the Publisher, and sales by others of such editions of the Work for the Publisher's interest pursuant to special arrangements, in the United States through regular paperback sales channels:

with respect to trade paperback editions: when sold at a discount of less than fifty percent (50%) of list price, a royalty of ten percent (10%) of list price on copies sold;

when sold at a discount of greater than or equal to fifty percent (50%) but less than seventy-five percent (75%) of list price, a royalty of ten percent (10%) of the amount received by the Publisher.

with respect to mass market paperback editions: when sold at a discount of less than fifty-five percent (55%) of list price, a royalty of eight percent (8%) of the list price on the first 150,000 copies sold and ten percent (10%) of the list price on copies sold thereafter;

when sold at a discount of greater than or equal to fifty-five percent (55%) but less than seventy-five percent (75%) of list price, a royalty of ten percent (10%) of the amount received by the Publisher.

With respect to copies of paperback or paper-over-boards editions of the Work sold by the Publisher as described for hardcover editions in subpart (iv) of subparagraph (a) (discounts of seventy-five or more percent [75%]), and in subparagraphs (c) (Special Sales), (d) (Export), (e) (Mail Order), (f) (Limited Reprint) and (h) (Premium Sales) of this paragraph 5, a royalty at a rate equal to the rate specified in the applicable subpart or subparagraph, except that sales of trade paperback or paper-over-boards editions as described in subparagraphs (c), (d), and (f) shall be at a royalty rate equal to three-fourths (3/4) of the rate specified in the applicable subparagraph.

It is understood that the Publisher, at its discretion, has the right to license mass market and/or trade reprint rights to another publisher. All earnings from the licensing of such rights shall be subject to the provisions of Paragraph 7(a)(i).

The Publisher shall not (i) publish a trade paperback edition of the Work simultaneously with the initial hardcover edition or (ii) publish or authorize the publication of the mass-market paperback edition earlier than one year after hardcover publication, without the Author's consent. For the purposes of (ii), all references to the date of publication are meant to refer to the Publisher's announced month of publication; it is understood that initial shipments may occur approximately six weeks prior to that date and that copies may accordingly be available for sale before the earliest permitted publication date without violating this Agreement.

3

WAYANS 0023

~~(j)      *Audio Editions.* Except as provided in subparagraphs (e) and (h) above and in the second sentence of this subparagraph (j), on all copies of audio editions sold by the Publisher, a royalty equal to five percent (5%) of the list price, except that in the case of Audio Editions sold in electronic media, the royalty will be twenty percent (20%) of the amount received by the Publisher. In the case of any sales at a discount of seventy-five percent (75%) or more of list price, the royalty will be ten percent (10%) of the amount determined by deducting all manufacturing costs from the amount received by the Publisher.   The Author shall have approval of the reader of the Audio Edition and any abridged Audio Edition of the Work, such approval not to be unreasonably withheld or delayed. If the packaging of any Audio Edition of the Work is different from the Publisher's print edition of the Work, the Author shall have approval of the packaging, such approval not to be unreasonably withheld or delayed.~~

(k)      *Free Copies.* With respect to copies given away free to the Author or for publicity or promotional purposes, or to induce additional sales, and with respect to copies destroyed, no royalty shall be payable.

In all cases in subparagraphs (a) through (j) above, the computation of the number of copies sold shall be net of returns. Notwithstanding anything to the contrary contained herein, (i) if any royalty rate specified in this paragraph 5 is to escalate by reason of the number of copies sold, then no sales at discounts of more than fifty-four percent (54%) of list price shall be taken into account for the purpose of determining the rate to be applied; and (ii) if the list price of the Work is reduced by the Publisher for the purposes of any sales as to be forty or more percent (40%) less than the list price of the Work when initially published then for the purposes of calculating the amount of any discount upon such sale only, the list price of the Work shall be deemed to be the initial list price.   As used in this Agreement:  the sale of a copy of an electronic edition of the Work means the sale of a CD-ROM or other physical media containing a copy of the Work in electronic form or the dissemination for a fee of a an electronic copy other than on a physical medium (whether by transmission of a copy electronically for reading by means of a computer and/or other electronic media or authorization to download a copy); ~~and the sale of a copy of an audio edition of the Work means the sale of a record, tape, disk or other physical media containing a copy of the audio edition of the Work or the dissemination for a fee of an electronic copy other than on a physical medium (whether by the transmission of a copy electronically for listening by means of a computer and/or other electronic media or authorization to download a copy).~~The Author will earn a royalty in accordance with this paragraph 5 (but will not also be entitled to payment under paragraph 7) on sales of audio or electronic editions of the Work by or on behalf of the Publisher except where paragraph 5 provides that no royalty will be due. ~~If a U.S. affiliate of the Publisher publishes an audio edition of the Work, its edition will be treated as the Publisher's (and sales by the affiliate will be treated as sales by the Publisher) for the purposes of this Agreement.~~

Any royalty rates in this Paragraph 5 that escalate by reason of the number of copies sold will be applied separately to each Book (*i.e.* the royalty rate applicable to any sales of a Book will be determined based solely on applicable sales of that Book without regard to sales of the other Book(s) comprising the Work).

## SUBSIDIARY RIGHTS-GRANT OF RIGHTS

6.      (a)      *Definitions.* When used in this Agreement:

(i)      "Selection Rights" means the right to create, publish, distribute and sell condensed, adapted  (adapted versions shall be **subject to the Author's prior written approval**) and abridged English language versions of the Work in book form and the right to use all or any portion of the English language text of the Work (as well as any artwork included in the Work) in anthologies and other compilations in book form;

(ii)      "First Serial Rights" means the right to use all or any portion of the Work in the English language in newspapers, magazines and other periodicals (whether in one or more parts) before the date the Work is first available for sale to the public in book form, including the right to create for such use abridged, adapted (**adapted versions shall be subject to the Author's prior written approval**) and condensed versions of the Work;

(iii)      "Second Serial Rights" means the right to use all or any portion of the Work in the English language in newspapers, magazines and other periodicals (whether in one or more parts) on or after the date the Work is first available for sale to the public in book form, including the right to create for such use abridged, adapted (adapted versions shall be **subject to the Author's prior written approval**) and condensed versions of the Work;

(iv)      "Microfilm Rights" means the right to use all or any portion of the Work in the English language on microfilm, microfiche, image processing and other technologies now known or hereafter devised for storage, display and printing of images of the printed page;

(v)      "Electronic Text Rights" means the rights to use all or any portion of the English language text of the Work (as well as any artwork included in the Work) in electronic media (including, but not limited to, in electronic anthologies and other electronic compilations) and to create, and to use in electronic media, abridged, adapted and condensed versions of the English language text of the Work.  There are to be no changes to the text of the **Work without the Author's approval;  Electronic Text Rights shall be subject to the Author's prior written approval, not to be unreasonably withheld or**

4

WAYANS 0024

delayed and such licenses shall not be deemed to keep the Work "in print" once the Work has gone out of print in hardcover, trade paperback and mass-market paperback; ~~in each case whether or not artwork, text, sounds and/or other matter not taken from the Work are also used with the text and artwork from the Work;~~

~~(vi)     "Multimedia Rights" means the rights to create, and to use in electronic media, works in any language based on the Work (including the rights to create, and to incorporate into those works, artwork, text, sounds and other matter taken or derived from the Work or from the plot, characters, fanciful places, situations, ideas and events in the Work) as well as the right to incorporate into those works any artwork, text, sounds and/or other matter not taken or derived from the Work (provided, however, that if Movie and Television Rights are not also granted to the Publisher by this Agreement, Multimedia Rights do not include the right to create and use dramatic versions of the Work in electronic media);~~

~~(vii)     "Sound Reproduction Rights" means the rights to create and to use nondramatic English language readings of all or any portion of the Work (including condensed, adapted and abridged versions), whether in the form of records, tape recordings, sound cassettes, compact discs, electronic media or other technologies now known or hereafter devised, ("audio editions");     The Author shall have approval of such license, such approval not to be unreasonably withheld or delayed;~~

~~(viii)     "Translation Rights" means the right to translate the Work into languages other than English, and book publication rights, First Serial Rights, Second Serial Rights, Selection Rights, Microfilm Rights, Electronic Text Rights and Sound Reproduction Rights in languages other than English;~~

~~(ix)     "Movie and Television Rights" means motion picture and allied rights customarily granted to motion picture producers, television rights (including cassettes and other devices for home play) and all other mechanical or electronic visual dramatic reproduction rights, including all methods and technologies now known or hereafter devised;~~

~~(x)     "Game Rights" means the rights to create games in any language based on or including text, artwork, plot, characters, fanciful places, situations, ideas, and events in the Work and to reproduce, distribute and sell the games in the form of board games and/or to use the games in electronic media; and~~

(xi)     "Print Rights" means Selection Rights, First Serial Rights, Second Serial Rights, Microfilm Rights and Electronic Text Rights.

When used in paragraphs 5 and 7 and this paragraph 6: (A) "electronic media" means all electronic, magnetic, digital, optical, laser-based and other media, devices and systems for the storage, manipulation, display, retrieval, publication, distribution, broadcast and/or transmission of text, data, images, sounds and/or other information in any electronic form, whether now known or hereafter devised, including, without limitation, disk, CD-ROM, CDI, integrated circuit card or chip, and the Internet or other on-line computer network, service or database or satellite-based transmission, whether interactive or not; (B) "use" includes, without limitation, create copies or otherwise reproduce, publish, distribute, sell, transmit, upload, download and broadcast; (C) "periodicals" includes both print and electronic media editions of periodicals; (D) "artwork" means photographs, illustrations, paintings and other images (whether created by hand or through use of a camera, computer or other device now known or hereafter devised); and (E) "amount received by the Publisher" means sums of money actually received by the Publisher (less any taxes included in the amount received, less any insurance, shipping, mailing, freight, duties, customs clearance or other similar charges included in the amount received by the Publisher or paid by the Publisher, and less any foreign tax withholdings and in connection with the disposition of any rights granted herein outside the United States, any fees or commissions (not to exceed 15%) paid by the Publisher to finders or third-party sales or licensing agents in connection with the transaction).

(b)     Grant of Rights. The following additional and subsidiary rights in the Work are hereby included in those granted and assigned to the Publisher by subparagraph 1(c):

(i)     The sole and exclusive possession in the United States, its territories and dependencies of:

(A)     Selection Rights;
(B)     First Serial Rights (such licensing subject to the Author's approval of the periodical and cut, such approval not to be unreasonably withheld or delayed;
(C)     Second Serial Rights (including the right to include the magazine issue in which the excerpt appears in any media or form now in existence or hereafter developed. This right extends solely to the reproduction of the same issue in which the excerpt appears, and not to any right to reproduce the excerpt separate from said issue);
(D)     Microfilm Rights;
(E)     Electronic Text Rights (The Publisher may, without the Author's approval, solely for advertising and promotional purposes (and not for separate sale), disseminate one chapter (or less) of the Work only

5

WAYANS 0025

via electronic media or may make other electronic reproductions and disseminations of one chapter (or less) only of the Work, in the Publisher's sole discretion at no extra charge. The Publisher may also disseminate review copies in electronic form).

(F) ~~Translation Rights~~
~~(note: in the United States, its territories and dependencies only);~~

(ii) The sole and exclusive possession in the rest of the Exclusive Territory of Print Rights ~~and Translation Rights;~~

(iii) ~~The nonexclusive possession in the rest of the world other than the Excluded Territory of Print Rights and Translation Rights;~~

(iv) ~~The sole and exclusive possession throughout the world in all languages of:~~

(A) ~~Sound Reproduction Rights;~~

~~The grant of Sound Reproduction Rights to the Publisher will continue for an initial period ending on the 10th anniversary of the official publication date of the Publisher's initial Audio Edition of the Work in the Exclusive Territory. Such rights will automatically continue after the end of the initial period unless and until terminated by either party by written notice of termination sent at least six (6) months prior to the desired date of termination by registered or certified mail, return receipt requested. No notice of termination under this paragraph may be sent more than seven months before the end of the initial period; a notice sent prior thereto shall not be effective.~~

(B) ~~Multimedia Rights;~~
(C) ~~Movie and Television Rights;~~
(D) ~~Game Rights;~~
(E) ~~Live Theatrical Rights;~~
(F) ~~Cartoon strip, novelty, advertising and other commercial use of characters, fanciful places, situations, ideas, events and other material from the Work ("Merchandising Rights").~~

If any rights granted to the Publisher in electronic media are not granted to it on a worldwide basis, it may nevertheless exercise or authorize its licensees to exercise the rights granted, from or within the territory granted, on any on-line computer network, service or database or by satellite-based or other transmission even if some persons outside such territory may have access to such network, service, database or transmission. The Author may grant the U.K. publisher **the corresponding right to exercise the rights granted to the U.K. publisher from within the territory granted to the U.K. publisher, on any on-line computer network, service or database or by satellite based or other transmission even if some persons outside such territory may have access to such network, service, database or transmission.** If the Publisher is granted rights under multiple subparts above (e.g., both Electronic Text Rights and Sound Reproduction Rights), it may combine or authorize the combination of such rights into single products or services.

(c) *Reserved Rights*. All rights in the Work not granted to the Publisher by this Agreement shall remain the property of the Author. However, without limiting in any way the grant of rights to the Publisher or the warranties and representations contained elsewhere in this Agreement, the Author represents, warrants and covenants that the Author will not authorize or arrange for the publication, distribution or sale in any printed form (or other form granted to the Publisher) of a novelization, adaptation or other version of either the Work or a work in another medium based on the Work or from which the Work was derived (and the Author represents and warrants that the Author has not previously done so). The preceding sentence does not prohibit sequels or prequels to the Work or acting editions of plays based on the Work or, if the Publisher is not granted Translation Rights, non-English language works. **Multimedia Rights, Sound Reproduction Rights, Movie and Television Rights and Game Rights are reserved by the Author for his sole use and disposition. SEE RIDER TO PARAGRAPH 6(c).**

(d) *Permissions*. The Publisher also has the exclusive right to grant permissions to reproduce portions of the Work in print and other media granted to the Publisher by this Agreement in the Exclusive Territory and the non-exclusive right to do so in the rest of the world other than the Excluded Territory; the Author will earn one half of any payments received by the Publisher for such permissions. To promote the sale of the Work, the Publisher may distribute copies of the Work, such as review copies and advance reading copies, and may use or grant permission to use extracts from the Work without compensation therefor; promotional uses may be in any print or electronic media or any other media granted to the Publisher by this Agreement.

SUBSIDIARY RIGHTS–SHARING OF RECEIPTS

7. The Author will earn the percentages indicated below of the amount received by the Publisher from licenses to others of the following rights:

(a) *English Language U.S. Publication Rights*. From the following rights, when licensed for exercise in the United States, its territories and dependencies (regardless of any additional territory granted):

6

WAYANS 0026

| | To the Author | To the Publisher |
|---|---|---|
| (i)      Reprint rights to the Work in the English language in book form (except by book clubs or similar organizations) The Author shall have approval of the license of any mass-market paperback reprint edition, such approval not to be unreasonably withheld or delayed.  SEE Rider. | 50% | 50% |
| (ii)      Book club rights to the Work in the English language in book form (whether full length, condensed, abridged, or adapted (such adapted versions are subject to the Author's approval)  versions) | 50% | 50% |
| (iii)      Selection Rights, except to book clubs or similar organizations | 50% | 50% |
| (iv)      First Serial Rights | 90% | 10% |
| (v)      Second Serial Rights | 50% | 50% |
| (vi)      Microfilm Rights | 50% | 50% |
| (vii)      Electronic Text Rights (with the Author's approval not to be unreasonably withheld or delayed) | to be    mutually    agreed | |
| upon through good faith negotiation prior to any such use or disposition | ~~50%~~ | ~~50%~~ |

(b)      *English Language Non-U.S. Publication Rights.* From English language book publication rights and Print Rights when licensed for exercise solely outside the United States, its territories and dependencies:

| | To the Author | To the Publisher |
|---|---|---|
| (i)      Licenses for exercise in Canada | 66 2/3% | 33 1/3% |
| (ii)      Licenses for exercise solely outside the United States, its territories and dependencies and Canada | 80% | 20% |

~~(c)      *Other Subsidiary Rights.* From the following rights:~~

| | To the Author | To the Publisher |
|---|---|---|
| ~~(i)~~      ~~Sound Reproduction Rights~~ | ~~50%~~ | ~~50%~~ |
| ~~(ii)~~      ~~Translation Rights in the United States, its territories and dependencies and Canada~~ | ~~75%~~ | ~~25%~~ |
| ~~(iii)~~      ~~Translation Rights in the rest of the world~~ | ~~75%~~ | ~~25%~~ |
| ~~(iv)~~      ~~Multimedia Rights~~ | ~~75%~~ | ~~25%~~ |
| ~~(v)~~      ~~Movie and Television Rights~~ | ~~75%~~ | ~~25%~~ |
| ~~(vi)~~      ~~Game Rights~~ | ~~75%~~ | ~~25%~~ |
| ~~(vii)~~      ~~Live Theatrical Rights~~ | ~~75%~~ | ~~25%~~ |
| ~~(viii)~~      ~~Merchandising Rights~~ | ~~75%~~ | ~~25%~~ |

If the Publisher elects to itself exercise any of the above rights for which a royalty is not provided elsewhere in this Agreement, the Author will earn royalties with respect to the exercised rights in amounts  to be negotiated in good faith prior to any such use or disposition ~~consistent with applicable industry standards as reasonably determined by the Publisher.~~

~~In the event the Publisher has not published an Audio Edition of the Work by the end of one (1) year from the date of the initial publication of the Work, the Author may send the Publisher, by certified or registered mail, return receipt requested, a written notice specifically referencing this paragraph 7 that the Publisher has exercised such rights, and the Publisher shall have thirty (30) days from the receipt of said written notice to publish an Audio Edition.  In the event the Publisher still has not published an Audio Edition after said thirty (30) days, the Author shall thereafter have the right to revoke such rights, by giving written notice to the Publisher by registered or certified mail, return receipt requested, which notice shall not be effective unless received by the Publisher prior to the Publisher's publication of an Audio Edition.~~

**AUTHOR'S COPIES**

8. The Publisher agrees to give to the Author  fifty (50) ~~ten (10)~~ free copies of   each hardcover ~~the Publisher's initial regular edition~~ of the Work and  fifty (50)) ~~five (5~~ free copies of any paperback editions published by the Publisher  and if available, fifty (50) copies of any reprint edition licensed by the Publisher.  The Author may buy additional copies of the Publisher's editions of  each publication of the Work for the Author's personal use (subject to availability in inventory) at a price equal to sixty percent (60%) of list price plus the cost of warehouse shipping, packaging and freight or postage. The Author must pay the Publisher for the copies ordered, by check made payable to the Publisher, prior to shipment. Copies purchased are non-returnable and are not for resale.  The Author will receive the specified number of copies of each Book comprising the Work.

WAYANS 0027

## STATEMENTS AND PAYMENTS

9.   (a)   Commencing on the Publisher's date of initial publication of the Work, the Publisher shall send to the Author on each January 31 a semi-annual statement of sales of the Work by the Publisher and of receipts respecting grants or licenses to others of rights with respect to the Work as of the previous October 31, and on each July 31 the Publisher shall send to the Author a semi-annual statement of such sales and receipts as of the previous April 30. The Publisher shall pay to the Author the amounts due the Author as shown in such statements on the date the statement shall have been due. Notwithstanding the foregoing, whenever the gross amounts due to the Author with respect to the Work shall fall below fifty dollars ($50) in the aggregate, then, after notification of such facts to the Author, no accountings or payment will be made until the next semi-annual statement and payment dates after such gross amount shall exceed fifty dollars ($50). In rendering any statement of sales, receipts and royalties and in making any payments hereunder, the Publisher may deduct and withhold a reserve against returns of copies of the Work in a reasonable amount. **The reserve against returns for each edition of each Book shall be held for the first four accounting periods with respect to that edition of that Book only, with no reserve thereafter except that the Publisher may hold a reserve for any period in which 500 or more copies have been shipped and for any period immediately following any such period.** In making any payments to the Author under any provision of this Agreement, the Publisher shall have the right to deduct any sums due to the Publisher from the Author. Notwithstanding the above, the Author shall be entitled to receive monies earned by the Author under this Agreement only to the extent that monies earned by the Author exceed the total advance paid and to be paid under paragraph 4; no payments shall be due prior to the time provided in paragraph 4 for payment of the final installment of the advance.

(b)   The Author shall have the right, upon prior written request, to examine at reasonable times the books of account of the Publisher insofar as they relate to the Work; such examination shall be at the sole expense of the Author unless errors of accounting amounting to five percent (5%) or more of the total sums paid to the Author pursuant to this Agreement shall be found to the Author's disadvantage, in which case, the reasonable cost of such examination shall be borne by the Publisher.

## LICENSES

10. The Publisher agrees promptly to advise the Author of the terms of any grants or licenses made by it with respect to the Work whenever the Author's share of the proceeds or royalty is likely to be in the aggregate five hundred dollars ($500) or more. **Upon written request by the Author or the Author's agent, the Publisher will provide copies of any such grants or licenses.**

## AUTHOR'S PROPERTY

11. The Publisher shall be responsible for only the same care of any property of the Author in its hands as it takes of its own. The Author shall retain copies of the manuscript and of all other documents or materials supplied to the Publisher for the Author's own protection. In the absence of a written request from the Author for their return, the Publisher, after publication of the Work, may dispose of the original manuscript and proofs.

## THE MANUSCRIPT

12.   (a)   The Author agrees to deliver to the Publisher no later than January 15, 2006 a typewritten original and a duplicate copy of a complete manuscript of each Book, each approximately 20,000 words in length, all in form and content complete and satisfactory to the Publisher. Together with, or as a part of the complete manuscript, the Author shall, at the Author's own expense, furnish to the Publisher photographs, drawings, charts, approximately 90-150 cartoon/line drawings, illustrations, index, appendix, bibliography and other related materials (collectively the "Related Materials") necessary in the Publisher's opinion for publication of the Work, all in form and content satisfactory to the Publisher. If the Author shall fail to deliver any of the Related Materials or to deliver the duplicate copy of the manuscript or if such Related Materials shall not be in form and content satisfactory to the Publisher, the Publisher may obtain, create or revise such materials as shall be missing or unsatisfactory and charge the actual reasonable cost thereof to the Author 's royalty account. If retyping of the manuscript is necessary to make it ready for the press, the Publisher may have it retyped and charge the cost of retyping to the Author. **For the purposes of this Agreement, there are no Related Materials.**

(b)   If releases or permissions from others are legally required for any material contained in the Work, the Author agrees to obtain and deliver such releases and permissions to the Publisher at the Author's own expense, in form acceptable to the Publisher, on or before the due date of the manuscript of the Work and to deliver them to the Publisher on request. The Publisher may obtain any such releases or permissions that are missing or unsatisfactory and charge the   actual reasonable cost thereof to the Author. **Without limiting the generality of the above, the Author confirms and agrees that the Author has obtained, or will obtain in time for publication, at the Author's sole cost and expense, written permission to use the cartoon/line-drawings included in the Work covering at least the uses and territories granted to the Publisher under this Agreement.   The Author will provide the Publisher with copies of such permissions upon request.**

(c)   If the Author does not deliver a completed manuscript to the Publisher by the agreed due date, the Publisher may, at any time thereafter, serve a written notice upon the Author requiring the Author to deliver a complete and satisfactory manuscript. If the Author does not comply within thirty (30) days of the giving of notice, the Publisher may thereafter terminate this Agreement at any time by written notice specifying a date of the Publisher's choosing as of which this Agreement is to terminate. If the Publisher serves such a

8

WAYANS 0028

written notice, all amounts paid by the Publisher to the Author pursuant to this Agreement shall upon such termination ~~immediately~~ be repaid by the Author to the Publisher and this Agreement shall terminate. ~~as of the date specified in the notice. However, the Publisher may cancel its notice of termination at any time prior to the date it is to take effect by both giving notice of its decision to cancel and simultaneously therewith returning to the Author any portion of the advance repaid by the Author pursuant to the preceding sentence.~~ Notwithstanding the above, the termination will (unless the Publisher otherwise elects) apply only to the particular Book that was not delivered on time, in which case: all rights in that particular Book will revert to the Author, but this Agreement (including, but not limited to, this Paragraph 12) shall remain in full force and effect with respect to the other Book(s) comprising the Work; the total advance provided for in paragraph 4 shall be reduced to exclude the portion attributable to the Book not delivered on time and the Author's obligation to repay amounts advanced shall be limited to the portion of the advance paid that is attributable to the Book not delivered on time. The Publisher may elect to have its termination apply to any other Book(s) comprising the Work that are unpublished at the time of the termination (in which case the consequences of termination specified in the preceding sentence as to the Book not delivered on time and the advance attributable to it will apply to those other Book(s) and the advance attributable to them as well).

(d)     If the Author delivers a manuscript ~~or Related Materials, either~~ of which the Publisher deems, in its sole discretion, to be unsatisfactory in either form or content, ~~or the Author does not deliver the Related Materials by the agreed due date,~~ then the Publisher may, at any time thereafter, serve a written notice upon the Author requiring the Author to deliver a satisfactory manuscript or to make revisions in the manuscript previously submitted ~~or to deliver satisfactory Related Materials.~~ If the Author does not comply within ninety (90) days after such written notice is given, the Publisher may thereafter terminate this Agreement in writing at any time. This Agreement shall terminate forthwith upon the giving of such notice of termination. If the Publisher so terminates this Agreement, all amounts paid by the Publisher to the Author under this Agreement shall immediately be repaid by the Author to the Publisher, provided, however, that if the Author has used best efforts to deliver a manuscript of a Book in form and content complete and satisfactory to the Publisher, such repayment shall be from the first (and, if necessary, any subsequent) monies paid by another publisher for the rights granted herein in such Book (or a revised version of it).

Notwithstanding the above, the termination will (unless the Publisher otherwise elects) apply only to the particular Book that was rejected, in which case: all rights in the rejected Book will revert to the Author, but this Agreement (including, but not limited to, this Paragraph 12) shall remain in full force and effect with respect to the other Book(s) comprising the Work; the total advance provided for in Paragraph 4 shall be reduced to exclude the portion attributable to the rejected Book; and the Author's obligation to repay amounts advanced shall be limited to the portion of the advance paid attributable to the rejected Book. The Publisher may elect to have its termination apply also to any other Book(s) comprising the Work that are unpublished at the time of termination (in which case the consequences of termination specified in the preceding sentence as to the rejected Book and the advance attributable to it will apply to those other Book(s) and the advance attributable to them as well).

**SUBSEQUENT EDITIONS**

~~13. The Author agrees at the Publisher's request to revise and prepare for press, free of charge, any revised edition of the Work, but if the Author neglects or is unable to do so for any reason, the Publisher may cause the same to be done and in such event the expense thereof shall be borne by the Author, or by the Author's estate. The Publisher shall have all the rights in all revised editions of the Work that the Publisher has in the original Work.~~

**PROOFS**

14.     (a)     The Author shall read and correct his proofs and return them to the Publisher within thirty (30) ~~twenty (20)~~ days of the proofs having been sent to the Author. If the Author shall fail to return the same within said period, the Publisher may publish the Work as printed therein with such ~~changes or~~ corrections as the Publisher shall deem necessary.
        (b)     The Publisher shall deduct from the Author's royalty account ~~any sums due the Author~~ all costs of the Author's corrections and alterations in proofs (other than printer's errors) in excess of ten percent (10%) of the original cost of composition.

**COMPETING WORKS**

15.     (a)     The Author shall not authorize ~~permit or arrange for~~ the publication, distribution or sale in the Exclusive Territory, otherwise than by the Publisher, of any printed work which will compete with the Work or diminish the value of any subsidiary or additional rights granted by this Agreement, except that the Author may grant licenses for the exploitation of any rights reserved to the Author under this Agreement. Author written sequels and prequels shall not be deemed a competing work.

9

WAYANS 0029

~~(b)      In no event shall the Author permit anyone other than the Publisher to publish, distribute or sell a paperback edition of the Work in the English language within one year after the date of initial publication by the Publisher of the Work, except in the Excluded Territory.~~

(c)   All references in subparagraphs 15(a) and (b) to the "Work" shall be deemed to refer to each of the Books comprising the Work considered separately.

**AUTHOR'S WARRANTY**

16.   (a)   The Author hereby warrants and represents:

(i)   that Keenen Wayans, Shawn Wayans and Marlon Wayans are the sole authors of the Work and the Author is the sole owner of the rights herein granted and that none of Keenen Wayans, Shawn Wayans, Marlon Wayans or the Author has not assigned, pledged or encumbered such rights or entered into any agreement which would derogate or conflict with the rights granted to Publisher herein and none of them will not do any of the above;

(ii)   that the Author has the full right, power and authority to enter into this Agreement and to grant the rights herein granted;

(iii)   that except for materials of others, permission for use of which has or will be obtained by the Author, the Work is original, previously unpublished and neither the Work nor any material portion thereof is in the public domain;

(iv)   that the Work does not contain any material which violates any right of privacy, which is libelous or which violates any personal or other right of any kind of any person or entity;

(v)   that the Work contains no material which would violate any contract of the Author and/or Keenen Wayans and/or Shawn Wayans and/or Marlon Wayans, express or implied, or which would disclose any information given to the Author and/or Keenen Wayans and/or Shawn Wayans and/or Marlon Wayans on the understanding that it would not be published or disclosed;

(vi)   that no material in the Work plagiarizes or pirates any other work or infringes on any copyright, trademark or other proprietary right; and

(vii)   that no recipe, formula or instruction contained in the Work is injurious to the user or others.

The warranties and representations contained in this Agreement extend to licensees and successors and assigns of the Publisher.

(b)   The Author shall indemnify and hold the Publisher, its licensees and their officers, directors, members, managers, employees, other agents, distributors and customers harmless from any loss, damage, payment or other expense (including reasonable attorneys' fees and disbursements) arising from any claim, demand, recovery, suit, civil or criminal proceeding (any of which are hereinafter a "lawsuit") which alleges facts contrary to or inconsistent with any of the representations and warranties made by the Author in this Agreement.  The Publisher may, but shall not be required to appeal any adverse decision. If the Publisher decides to settle a lawsuit and the Author agrees **which agreement shall not be unreasonably withheld or delayed**, the Author shall pay the amount of the settlement and all of the expenses (including reasonable attorneys' fees and disbursements) of the Publisher up to and through such settlement. If the Author shall not agree, the Publisher may settle without the Author's consent, **in which case the Author shall not be required to pay the amount of the settlement and the Publisher's expenses (including reasonable attorneys' fees and disbursements)** ~~unless (i) the Author shall establish that the decision to settle was unreasonable, in which case the Author shall not be liable to the Publisher with respect to the lawsuit or (ii) the Author shall establish that the amount of the settlement was unreasonable, in which case the Author shall be liable only for the Publisher's expenses (including reasonable attorneys' fees and disbursements) and for the reasonable portion of the settlement.~~

(c)   Upon receiving notice of any claim, demand, action or suit or other legal proceeding alleging facts inconsistent with or contrary to any of the warranties or representations contained in subparagraph 16(a), the Publisher shall have the right to withhold any sums payable to the Author under this Agreement, to be placed in an interest bearing account, in reasonable amounts as security for the payment of the Author's potential obligations pursuant to the indemnity contained in subparagraph 16(b). It is intended that the right granted by this subparagraph (c) shall not be unreasonably or frivolously exercised by the Publisher.  In the event no lawsuit has been instituted within one year from the date of receipt of any claim or demand, the Publisher shall promptly release any sums so withheld.

10

WAYANS 0030

## PRE-PUBLICATION REVIEW

17. Notwithstanding any other provision of this Agreement, the Publisher shall not be obligated to publish the Work if in the opinion of the Publisher's legal counsel it contains unlawful material or any material which may violate the rights of any person or party. If, in the opinion of the Publisher's legal counsel, there appears to be substantial risk of legal action or liability on account of the Work, the Author shall make such revisions or deletions in the Work as shall be necessary in the opinion of the ~~Publisher or the~~ Publisher's legal counsel to remove any such risk. No such revisions or deletions, and no request for substantiation, shall be deemed to impose on the Publisher any obligation of verification, or to affect in any way the Author's warranties or representations or duty of indemnification which shall continue to apply to all material in the Work, whether or not changed at the request ~~of the Publisher or~~ the Publisher's legal counsel. If the Author does not make, or authorize the Publisher to make such revisions or deletions, or if such Work is unpublishable in the opinion of the Publisher's legal counsel, then the Publisher may terminate this Agreement in writing within the time provided in paragraph 30 hereunder, ~~at any time prior to publication.~~ In the event of any termination of **this Agreement, all amounts advanced by the Publisher to the Author pursuant to this Agreement shall be promptly repaid by the Author to the Publisher. Notwithstanding the above, this Paragraph 17 shall apply separately to each Book; any termination pursuant to this Paragraph 17 shall apply only to the particular Book involved. In the event of termination as to a particular Book: all rights in the terminated Book will revert to the Author, but this Agreement shall remain in full force and effect with respect to the other Book(s) comprising the Work; the total advance provided for in Paragraph 4 shall be reduced to exclude the portion attributable to the terminated Book; and the Author's obligation to repay amounts advanced shall be limited to the portion of the advance paid that is attributable to the terminated Book.**

## REMAINDER SALES

18. The Publisher will use reasonable efforts to inform the Author if it plans to remainder its inventory of copies of the Work and to offer to sell to the Author all of the copies of the Work to be remaindered at a price equal to the price the Publisher reasonably anticipates receiving in the remainder sale (but the Publisher's failure to do so will not constitute a breach of this Agreement). There will be no remainder sale of the **Publisher's edition of a Book made earlier than one year from the initial date of publication of said edition of such Book.**

## TERMINATION

19.   (a) (i) If the Publisher determines, in its sole discretion, that the Work or any edition thereof has ceased to have a remunerative sale, the Publisher may discontinue publication. If, at any time after its initial publication by the Publisher, the Work is "Unavailable for Sale" (as defined below), the Publisher will, within six months after the Publisher's receipt of a written request from the Author for reversion of rights in the Work, do one of the following to be selected by the Publisher in its sole discretion:  (i) arrange for a print ~~or electronic~~ edition of the Work published by the Publisher or a licensee to be available for sale in the United States within 6 months; or (ii) upon payment to the Publisher of any sums owed by the Author to the Publisher for books purchased by the Author or pursuant to paragraph 16, terminate this Agreement and revert all rights in the Work to the Author. In addition, if, at any time after its initial publication by the Publisher, orders for copies of the Work are filled only by copies produced on an on-demand basis (*i.e.*, neither the Publisher nor any licensee maintains an inventory of the Work) and for each of two consecutive accounting periods fewer than 150 copies of the Work are sold by the Publisher and its licensees, the Publisher will, within six months after its receipt of a written request from the Author for reversion of rights in the Work, do one of the following to be selected by the Publisher in its sole discretion: (i) arrange for a printing or reprinting of a print edition of the Work within 6 months; (ii) resolicit orders for the Work or take other steps which the Publisher reasonably believes are likely ~~take steps reasonably calculated~~ to increase aggregate sales of  print editions of the Work above 150 copies per accounting period; or (iii) upon payment to the Publisher of any sums owed by the Author to the Publisher for books purchased by the Author or pursuant to paragraph 16, terminate this Agreement and revert all rights in the Work to the Author.  If the Publisher elects (ii) in the immediately preceding sentence and aggregate sales do not increase to at least 150 copies in the next full accounting period, the Author may, within 30 days of the statement for that accounting period, terminate this Agreement by written notice sent by certified mail, return receipt requested.  For the purposes of this Agreement, the Work will be considered "Unavailable for Sale" if (and only if) there is no print ~~or electronic~~ edition of the Work published or licensed by the Publisher available for sale in the US. For the avoidance of doubt, the availability of an electronic text edition of the Work shall not be deemed to mean that the Work is "available for sale".

~~(ii) If the Publisher determines, in its sole discretion, that the Audio Edition of the Work has ceased to have a remunerative sale, the Publisher may discontinue publication of the Audio Edition. If, at any time after its initial publication by the Publisher, the Audio Edition of the Work is "Unavailable for Sale" (as defined below), the Publisher will, within six months after the Publisher's receipt of a written request from the Author for reversion of Sound Reproduction Rights in the Work, do one of the following to be selected by the Publisher in its sole discretion:  (i) arrange for an Audio Edition of the Work published by the Publisher or a licensee to be available for sale in the United States within  6  months; or (ii) upon~~

11

~~payment to the Publisher of any sums owed by the Author to the Publisher for books purchased by the Author or pursuant to paragraph 16, revert Sound Reproduction Rights in the Work only to the Author. In addition, if, at any time after its initial publication by the Publisher, orders for copies of the Audio Edition of the Work are filled only by copies produced on an on-demand basis (i. e., neither the Publisher nor any licensee maintains an inventory of the Audio Edition of the Work) and for each of two consecutive accounting periods fewer than 100 copies of the Audio Edition of the Work are sold by the Publisher and its licensees, the Publisher will, within six months after its receipt of a written request from the Author for reversion of Sound Reproduction Rights in the Work only, do one of the following to be selected by the Publisher in its sole discretion: (i) arrange for manufacturing or re-manufacturing of an Audio Edition of the Work within 6 months; (ii)    re-solicit orders for the Audio Edition of the Work or take other steps which the Publisher reasonably believes are likely   take steps reasonably calculated to increase aggregate sales of   Audio Editions of the Work above 100 copies per accounting period; or (iii) upon payment to the Publisher of any sums owed by the Author to the Publisher for books purchased by the Author or pursuant to paragraph 16, revert Sound Reproduction Rights in the Work only to the Author.    If the Publisher elects (ii) in the immediately preceding sentence and aggregate sales do not increase to at least 100 copies in the next full accounting period, the Author may, within 30 days of the statement for that accounting period, terminate the grant of Sound Reproduction Rights in the Work only by written notice sent by certified mail, return receipt requested.    For the purposes of this Agreement, the Audio Edition of the Work will be considered "Unavailable for Sale" if (and only if) there is no Audio Edition of the Work published or licensed by the Publisher available for sale in the US.~~

Notwithstanding the above, this subparagraph 19(a) shall apply separately to each Book; any termination pursuant to this subparagraph 19(a) shall apply only to the Book(s) that are Unavailable for Sale and are terminated through the procedure provided above; this Agreement shall continue in full force and effect with respect to any other Book(s) comprising the Work.

(b)    Termination of this Agreement ~~or reversion or termination of Sound Reproduction Rights in the Work~~, whether or not pursuant to subparagraph 19(a), is subject to the continuation of any already fully-executed options, grants or licenses with respect to the Work previously granted by the Publisher and to the continuing receipt and retention by the Publisher of its share of the proceeds from such options, grants or licenses. The Publisher will also retain the right to thereafter dispose of remaining copies and any copies returned, subject to payment of any royalties as herein provided. The provisions of paragraph 20 shall survive the termination of this Agreement pursuant to subparagraph 19(a). The provisions of paragraphs 9, 11, 16, 21, and 23 through 29 shall survive any termination of this Agreement, whether pursuant to subparagraph 19(a) or otherwise. .  Upon termination, copies of any outstanding licenses will be given to the Author by the Publisher.  SEE RIDER TO PARAGRAPH 19(b).

**OPTION**

~~20.  The Author agrees to submit in writing the Author's Next Work (as defined below) for publication by the Publisher before soliciting offers from other publishers. The Publisher shall be entitled to a period of thirty (30) days after receipt of the submission (which thirty (30) day period shall not commence in any event before the end of ninety (90) days after acceptance of a complete and satisfactory manuscript of the Work by the Publisher) within which to notify the Author of whether it will exercise its option with respect to the Next Work. If within that time the Publisher shall notify the Author that it is exercising its option, the Author and the Publisher shall thereupon enter into negotiations towards an agreement concerning that Next Work. If the Publisher and the Author shall be unable within an additional sixty (60) days after the end of such thirty (30) days to arrive at a mutually satisfactory agreement, the Author shall be free to submit that Next Work elsewhere, provided, however, that the Author shall not (i) in any event enter into a contract for the publication of that Next Work with any other publisher upon the same terms or upon terms less favorable to the Author than those offered by the Publisher or (ii) enter into a contract for publication of that Next Work on terms more favorable to the Author than those offered by the Publisher without first giving the Publisher a further option to enter into a contract as favorable to the Author as that offered by the other publisher, such further option shall be exercised by giving notice to the Author at any time within thirty (30) days of the Author giving written notice to the Publisher of the offer. The term "Next Work" as used herein shall mean each of the unpublished book length works of fiction and nonfiction of the Author (whenever written) which the Author shall desire to submit at any time to any publisher for publication until such time as the Author shall enter into a binding agreement with the Publisher or another publisher under this paragraph 20 for publication in the United States of a Next Work which was written by the Author after the completion of the Work.~~
SEE RIDER FOR PARAGRAPH 20.

**AGENCY**

21. ~~The Author hereby authorizes the Author's agent, William Morris Agency, Inc., 1325 Avenue of the Americas, New York, New York 10019 to collect and receive all sums of money payable to the Author pursuant to any of the provisions of this Agreement. The said agent is fully authorized and empowered to act on behalf of the Author in all matters in any way arising out of this Agreement. The Publisher shall may pay all sums hereunder to the said agent and may rely on the said agent in all matters arising out of this Agreement, including, without limitation, amendment of this Agreement or settlement of any controversies arising out of this Agreement, until the Publisher shall have received written notice from the Author of the termination of~~

12

WAYANS 0032

~~such agency. Upon the receipt of such notice, the Publisher shall pay all further sums payable pursuant to this Agreement directly to the Author or to such other persons as the Author shall direct in writing.~~
The Author irrevocably appoints William Morris Agency, LLC. as the Author's sole and exclusive agent (the "Agent") with respect to the Work for the life of the copyright (and all renewals and extensions thereof) and authorizes and directs the Publisher to make all payments due or to become due to the Author hereunder to and in the name of said Agent, and to accept the receipt by the Agent as full evidence and satisfaction of such payments. As sole and exclusive Agent, the Agent is hereby irrevocably authorized and empowered by the Author (i) to act on the Author's behalf in all matters arising from and pertaining to this Agreement, (ii) to negotiate for the Author throughout the world as to the disposal of all rights in and to the Work and (iii) to receive in the Agent's name all monies due or to become due to the Author in connection with the disposal of any such rights.  In consideration for services rendered, the Agent is entitled to receive or retain as its commission (and is hereby irrevocably assigned):

 (i) fifteen percent (15%) of gross monies paid to the Author hereunder and from the disposal of all other publication and audio rights in and to the Work, except that such commission shall be twenty percent (20%) with respect to the disposal of British publication and audio rights and foreign language publication and audio rights if and to the extent such rights have not been conveyed to the Publisher pursuant to this Agreement; and

 (ii) ten percent (10%) from the disposal of all other rights in and to the Work.
The provisions of this paragraph shall survive the expiration of the Agreement and are specifically included for the benefit of the Agent, which is hereby named a third-party beneficiary.  If there is any inconsistency between the terms of this paragraph and any other agency agreement between the Author and the Agent applicable to the Work, the terms of this paragraph shall prevail.  Author's agent is William Morris Agency, LLC, Attn:  Tracy Fisher.

The Publisher's obligations under this paragraph are limited to the payment of net amounts due to the Author under the terms of this Agreement by check payable to said agent.

INSERT OF ADVERTISEMENTS

22. Advertisements other than for other books published by the Publisher may not be inserted or printed in any edition of the Work ~~whether issued by the Publisher or its licensee,~~ without the Author's written consent. The Author may require that a share of the advertising proceeds, if any, be paid to the Author as a condition for the Author's consent, if the Author so elects. ~~Nothing herein shall preclude the Publisher from authorizing a book club to include notices of availability of other products from the book club within the book club's edition of the Work.~~

ASSIGNMENT

23. This Agreement shall be binding upon and inure to the benefit of the successor and assigns of the Publisher. This Agreement shall be binding upon the successors, heirs and estate of the Author. The Author may assign any net sums due to the Author hereunder, but may not otherwise assign any of the Author's rights under this Agreement or delegate any of the Author's duties or obligations under this Agreement.  SEE RIDER TO PARAGRAPH 23.

FURTHER DOCUMENTS

24. The Author agrees to execute and deliver to the Publisher any and all documents in proper or customary form necessary or helpful to the use, sale, license or other disposition of any or all rights granted to the Publisher herein, or for more fully carrying out the purposes and intent of this Agreement. The Author hereby irrevocably appoints the Publisher as the Author's attorney-in-fact to execute any such documents.

REMEDIES

25.   Except where otherwise stated in this Agreement, all ~~All~~ remedies granted to either party ~~Publisher~~ pursuant to any provisions of this Agreement are cumulative and neither the availability nor exercise of any such remedy shall prevent either party ~~the Publisher~~ from exercising any other remedy which it would otherwise have under this Agreement or by law. No person or entity is intended to be a third-party beneficiary of any of the Publisher's obligations hereunder (provided that the foregoing shall not be construed as detracting from the Agent's right under paragraph 21 to receive payment of the net amounts due to the Author under the terms of this Agreement). If the Author is more than one person, the liabilities and obligations of the persons comprising the Author shall be joint and several.

13

WAYANS 0033

**NOTICES**

26. All notices, bills, requests, demands or other communications required or permitted to be given by any of the provisions of this Agreement shall be sufficient if sent by regular first class mail (unless the provision permitting or requiring such notice, bill, request, demand or other communication calls for another type of mail, in which case such other type of mail shall be required) and shall be deemed given when mailed (unless the provision permitting or requiring such notice, bill, demand or other communication shall otherwise provide). All such notices, bills, requests, demands or other communications shall be addressed to the Author at the address set forth at the beginning of this Agreement (or to such address as the Author shall have designated by thirty (30) days' prior written notice), or to the Publisher at 175 Fifth Avenue, New York, New York 10010, (or to such other address as the Publisher shall have designated by thirty (30) days' prior written notice).

**ENTIRE AGREEMENT**

27. This Agreement and the attached riders constitutes the entire agreement between the Publisher and the Author. This Agreement cannot be amended, modified or waived except in a writing signed by the party (or its duly authorized agent) against whom such amendment, modification or waiver is to be enforced. Without limiting the generality of the foregoing, whenever the Publisher or the Author shall be given a right to terminate this Agreement pursuant to any of the provisions of this Agreement, no negotiations between the Publisher and the Author nor any other act of the Publisher or Author (other than an express waiver in writing signed by the Publisher or the Author) at any time shall be deemed a waiver of the right of termination nor of the effectiveness of any notice of termination. This Agreement creates an independent contractor relationship between the Author and the Publisher; it does not create, and shall not be construed as creating, a partnership or joint venture between the Author and the Publisher. This Agreement is not binding on the Publisher, and the Publisher is not obligated with respect to the Work, unless and until this Agreement is executed by the Chairman, President, Chief Operating Officer, Vice-President-Administration or Senior Vice-President and General Counsel of the Publisher.

**APPLICABLE LAW**

28. This Agreement, and the rights and remedies of the parties with respect to it, shall be governed by the internal laws of the State of New York.

**CAPTIONS**

29. The captions of the various paragraphs and subparagraphs of this Agreement have been inserted only for the purposes of convenience; such captions are not a part of this Agreement and shall not be deemed, in any manner, to modify, explain, enlarge or restrict any of the provisions of this Agreement.

## *In witness whereof,*

the parties hereto have duly executed this Agreement.

AUTHOR: SMK Merchandising LLC

By:
Name: MARLON WAYANS
Title: MEMBER

ST. MARTIN'S PRESS, LLC

By:

14

WAYANS 0034

6(c) RESERVED RIGHTS: All rights in the Work now existing, or which may hereafter come into existence, not specifically herein granted, are reserved to the Author for the Author's use at any time. Reserved rights include, but are not limited to, the right to publish or cause to be published excerpts and summaries of television (broadcast, cable, or home video) programs, **electronic multimedia versions** and motion pictures based upon the Work; provided, however, that the Author agrees that none of said excerpts or summaries shall exceed 7,500 words in length; that none of such excerpts or summaries are published in a print media form or in a publication (be it paperback, magazine, newspaper or other) that is itself offered for sale to the public; that the appropriate copyright notice is placed on all copies of such excerpts or summaries; and that such right of excerpt or summary may only be granted, used or retransferred in connection with theatrical, television (broadcast, cable or home video), **electronic multimedia versions** or motion picture rights. However, it is expressly agreed that, with the exception of the 7,500 word right of excerpt or summary stated above, the Author may not permit or arrange for the publication in any printed form of a novelization or other version of the Work , **or a television program, motion picture, electronic media version or other audio-visual version based on the Work.**

7a)(I)  It is agreed that any reprint agreement shall stipulate that the reprint edition must be published within ~~three (3)~~ two **(2)** years from the initial date of hardcover publication, unless the reprint agreement is signed in or after the ~~third~~ second year from the initial date of hardcover publication, in which case the reprint agreement shall include a stipulation that the reprint edition shall be published no later than nine months from the date of signing of such agreement.

19(b)  Notwithstanding anything to the contrary contained herein, the Publisher agrees not to extend the term of any outstanding licenses after its receipt of a request for termination.

20)  The Publisher shall have the first option to publish the next work of fiction or non-fiction written by **Keenan Wayans, Shawn Wayans and Marlon Wayans** upon terms to be mutually agreed.  The Publisher shall have thirty (30) days from the date the option work is submitted to consider the work and exercise this option.  The option work shall be considered on the basis of a reasonably detailed outline.

23)  The Publisher shall not assign this Agreement to any other person or company except that the Publisher may assign it to a subsidiary, parent or affiliated company of the Publisher, to a  company successor of the Publisher by merger, consolidation or reorganization of the Publisher, or in connection with a sale of (i) all, or substantially all, of the assets of the Publisher, or (ii) the major imprint of the Publisher **under which the Work was or is to be published**, or (iii) a major line of the Publisher's business.  The foregoing shall in no way be deemed as limiting the right of the Publisher to license rights in the Work granted to it by this Agreement.

30)  ACCEPTABILITY OF MANUSCRIPT:  The Publisher shall have sixty (60) days following receipt of the complete manuscript of a Book to accept the manuscript or request revisions.  If the Publisher requests revisions, the Author shall deliver such revisions within ninety (90) days thereafter and the Publisher shall have a further thirty (30) days within which to accept such revisions.  Failure to notify the Author within such period shall constitute acceptance by the Publisher, except if the manuscript must undergo pre-publication review by the Publisher's legal counsel, in which case the Publisher shall have an additional sixty (60) days to respond.

15

WAYANS 0035

# Exhibit "B"

Date: 12/13/10

# Title Sales Summary By Month

**0312359691**       **101 WAYS TO KNOW ... GOLDDIGGER**                          **WAYANS, MARLON**

ISBN13/EAN: 9780312359690

| | | | |
|---|---|---|---|
| List Price: $10.95 | | | Status: AS |
| Net Price: $0.00 | On-Hand: 8,143 | Total Inv: 8,143 | Domestic Pack: 0 |
| Medium: TP | + In Transit 0 | Resrv: 0 | Cnsgnmnt Pack: 0 |
| St Martins Trade | - Merge & On-Pick 1 | On Order: 0 | Unavailable: 0 |
| SMP Trade Paper | Invoiceable: 8,142 | Backorder: 0 | Alt Price Inv: 0 |
| SMP Trade Paper Pr Yr | | Credit Hold: 0 | Bindery: 0 |
| Editor: BEIER, ELIZABETH | | | |

Status Domestic:
Status Export:
Min Inv: 1,000
Last Price: $9.95
Price Chg Dt: 10/14/08
Unit Cost: 0.67
Weight: 0.29

Pub Date: 6/9/09
Release Date: 5/20/09
On Sale Date: 6/9/09
EAN Version:

Crtn: 148
Pg Ct: 112
Digital Print: N
Holt Rem Nt:

Marketing Expense | Inventory By Site | Historical PO | 1 Month Sales | Coresource | Palgrave XRef
Curr Month Ship/On-Pick | Sls Analysis By Title | Channel Sales Hist | Remainder & Book Club | POS Yearly/Title | POS Yearly/Author | POS Weekly Tracking
College Rollup | Plant Costs | Hist. Sales | Backorder Detail | Credit Hold | Comp Units | Rights

| Year | Month | Gross Units | Return Units | Net Units | Gross Amount | Return Amount | Net Amount | Comp Units | Remainder U |
|---|---|---|---|---|---|---|---|---|---|
| Life to Date | | 16,137 | 15,212 | 925 | $91,510 | $85,844 | $5,681 | 460 | 0 |
| 2010 | 12 | 1 | 24 | -23 | $5 | $143 | ($138) | 0 | 0 |
| | 11 | 0 | 26 | -26 | 0 | $153 | ($153) | 0 | 0 |
| | 10 | 3 | 11 | -8 | $15 | $65 | ($49) | 0 | 0 |
| | 9 | 4 | 40 | -36 | $25 | $233 | ($207) | 0 | 0 |
| | 8 | 2 | 61 | -59 | $10 | $357 | ($346) | 0 | 0 |
| | 7 | 0 | 43 | -43 | 0 | $252 | ($252) | 0 | 0 |
| | 6 | 0 | 135 | -135 | 0 | $822 | ($822) | 0 | 0 |
| | 5 | 3 | 89 | -86 | $16 | $513 | ($497) | 0 | 0 |
| | 4 | 10 | 156 | -146 | $55 | $924 | ($869) | 0 | 0 |
| | 3 | 13 | 483 | -470 | $74 | $2,940 | ($2,866) | 0 | 0 |
| | 2 | 5 | 711 | -706 | $14 | $4,007 | ($3,992) | 0 | 0 |
| | 1 | 1 | 1,106 | -1,105 | $1 | $6,475 | ($6,473) | 1 | 0 |
| 2010 | | 42 | 2,885 | -2,843 | $215 | $16,884 | -16,664 | 1 | 0 |
| 2009 | 12 | 5 | 2,751 | -2,746 | $27 | $16,120 | ($16,092) | 21 | 0 |
| | 11 | 9 | 1,225 | -1,216 | $50 | $7,033 | ($6,983) | -3 | 0 |
| | 10 | 10 | 2,566 | -2,556 | $48 | $14,355 | ($14,306) | 0 | 0 |
| | 9 | 20 | 3,632 | -3,612 | $109 | $20,232 | ($20,124) | 0 | 0 |
| | 8 | 40 | 1,092 | -1,052 | $230 | $6,149 | ($5,917) | 0 | 0 |
| | 7 | 64 | 896 | -832 | $378 | $5,044 | ($4,665) | 4 | 0 |
| | 6 | 14,471 | 165 | 14,306 | $82,195 | $27 | $82,168 | 409 | 0 |
| | 5 | 1,476 | 0 | 1,476 | $8,258 | 0 | $8,258 | 28 | 0 |
| | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2009 | | 16,095 | 12,327 | 3,768 | $91,295 | $68,960 | $22,339 | 459 | 0 |